Page 1

UNITED STATES BANKRUPTCY COURT.
SOUTHERN DISTRICT OF FLORIDA

IN RE:                          CASE NO. 15-30368-RBR

DM RECORDS, INC.,

        Debtor.
_____/


                    ECF #173

                October 11, 2016


        The above-entitled cause came on for hearing before the Honorable RAYMOND B. RAY, one of the Judges in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd., Fort Lauderdale, Broward County, Florida on October 11, 2016, commencing at or about 10:00 a.m., and the following proceedings were had.


        Transcribed from a digital recording by:
            Cheryl L. Jenkins, RPR, RMR

APPEARANCES:


LESLIE OSBORNE, Trustee

MERRILL P.A., by
DAVID MERRILL, Esquire
On behalf of the Debtor


FURR & COHEN, by
ALVIN S. GOLDSTEIN, Esquire
On behalf of Alvertis Isbell


ALSO PRESENT

ECRO - Electronic Court Reporting Operator

- - - - - - -

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

THE COURT:  DM Records, Inc.

MR. OSBORNE:  Good morning, your Honor. Les Osborne, Chapter 11 trustee.

MR. MERRILL:  David Merrill for the debtor, your Honor, M-e-r-r-i-l-l.

MR. GOLDBERG:  Good morning, your Honor Alvin Goldstein, Furr & Cohen, for creditor Alvertis, A-l-v-e-r-t-i-s, Isbell, I-s-b-e-l-l.

THE COURT:  All right.  Mr. Osborne.

MR. OSBORNE:  Yes, your Honor.  We're here on my motion to convert the case.

I've laid out in my motion that looking at the monthly operating reports, the cash sales of this business are essentially running at a point where it just can't reorganize in my opinion.  They have had some -- one large account receivable that was sort of prepetition that was collected, which skews the numbers, that was about $125,000, but outside of that they're operating at roughly 14 to $15,000 a month gross.  After expenses there is minimal left over in this case.

Now, there is a judgment for Bell in the amount of $2.25 million.  In the last two weeks there has now been a second amended plan filed by the Watsons, and disclosure statement, which challenges that judgment, and there is an objection to claim that was filed that

Page 4

challenges that judgment.  I believe both of these items, the nicest thing I can say about them are frivolous, if not outright fraud.

The judgment was for Bell in the amount of $2.25 million.  The argument raised in the objection to claim and in the plan is that, well, Tag Team is entitled to half that money and, therefore, the judgment is really only 1.1, Tag Team being the other 50 percent owner of Whoomp!  (There It Is), which is the primary asset of this estate.

The problem with that is this is the direct argument that was raised in front of the District Court. It was raised at the 5th Circuit Court of Appeals.  It was directly addressed by the 5th Circuit Court of Appeals, who affirmed the lower court, and specifically held that the award of the 2.25 million full amount to Bell was proper, and that further, if there was an issue with it, they didn't say it directly, but they cited the cases that essentially said if Tag Team has got a problem with it, Tag Team can deal with Bell in a separate proceeding, but it has nothing to do with this debtor.  This debtor owes $2.25 million to a judgment that is unfutable.

Based upon that, the only way that these creditors get paid in this case is to liquidate the assets.  I don't need to be in an 11 to do that.

The main asset, there was at least one offer put up at 1.7, which we are -- million, which we're exploring.  The debtor has told me they know someone who might be able to come up with someone who might put up even more money, which would be great.  If we get enough money to pay all creditors, there will be money to equity.  As it stands now I don't see it, but it is possible, but in any event, it's not going to be through the operations, it's going to be through the liquidation of the primary assets.

Now, the debtor has also now for the first time -- well, not for the first time, they have recently amended their schedules to say they may have an interest in a song by Prince called the Most Beautiful Girl in the World, and that could be worth even more money than Whoomp!  (There It Is).  The problem is they can't give me any information on it whatsoever.  When I had asked for what information they have as to what their ownership is or what rights they have, their answer was, well, we think we may have bought it 15 years ago, you need to ask Bell, at which point Bell's attorney says they have no interest.  So, I've not been given anything to show that that asset is real.

However, even if that asset is real, again, the sale of that asset, if there is excess funds, can be

Page 6

paid over to the Watsons if, in fact, it is a real asset.

There is also some litigation going on, or that we have hired counsel for, but essentially that's all that's going on here.  The operations, while they -- it has been a historically profitable company, that was without a $2 million judgment hanging over its head.

It's a company that makes anywhere from 2 to $300,000 a year.  Using the projections in their own second amended plan, they're still looking at $20,000 a month, with a net income of 8,000 a month, or 8,000 and change.  So even using the figures that they've produced, there is no way to reorganize outside of liquidation of the asset, and once you liquidate Whoomp!  (There It Is), there is generally little to no income.  That is the primary asset.

So, I don't believe that there is any way for a reorganization.  I believe conversion is proper.

Finally, I would point out to the Court another little thing, which is not in my motion, but as a matter of law things have changed since I filed my motion, in that this case qualifies as a small business case.

Under the definitions of small business, it meets the definition of a small business case as a matter of law, and as a small business case a plan has to be filed within 300 days, which would have been

Page 7

September 14th.  This plan was not.  Therefore, as a matter of law there is no plan that can be confirmed under, I believe it's 1129 and 1121.  Therefore, the only option is conversion or dismissal, and we all believe conversion is proper, and by "we all", I believe that's myself and the creditor.

Again, there is more I can go into if the Court needs to hear it, but I ---

THE COURT:  No, I'm very familiar with this case.

Mr. Merrill, your response, Docket Entry 196.

MR. MERRILL:  Yes, good morning, your Honor.  David Merrill, again M-e-r-r-i-l-l, for the debtor.

With the greatest respect to Mr. Osborne's colloquy, the only sworn to facts in this case are that every recitation that has been presented is incorrect.

Let's start with how much money has been brought in since the filing of this case.  There has been $300,000 brought in in this case.  We have the CPA in this case who has an attachment to our response and claim that the figures indicating that $3,000 a month in net income is simply wrong, that it's substantially more than that.

With respect to ---

THE COURT:  That's reflected by the debtor's

periodic monthly reports?

MR. MERRILL:  When you divide the number with the $300,000, the CPA's figures are correct, and in the context of all of that, to make the statement that a prepetition receivable shouldn't be counted is a misunderstanding of the music business.

The music business is all about receivables. They get paid in arrears based upon performances that are done of their songs, and that's how this business operates.

Also, a substantial portion of the business is unfortunately litigating and dealing with people who infringe your copyright.  One of the things that we found out within the last month, month and a half, is that a very recent movie, Dead Pool, staring Ryan Reynolds, they actually have used one of DM Records' properties in violation of their copyright, and there is funds, we believe in excess of $80,000 in income, that's going to be generated from that, but that's the nature of the business.  I believe that movie came out before this case was filed, but as things go along, you learn about the use of your intellectual property, you get to get paid, and that's how that works.

Now, again, I want to emphasize that all of this, the only sworn to facts in this case are those sworn

to by the, by the Watsons, they are the equity owners in this business, and they are the ones that have provided the only sworn to evidence with respect to this.

Now, we need to talk about the claim.  It was raised, and it makes an impact with respect to can this case be confirmed.  There are two major flaws in what has been presented, both by, you know, the motion and I'm certain this is going to be responded to vigorously by Isbell's counsel.  I'm going to start by saying that the 5th Circuit mandate, we gave you the language, there is no fraud, there is no frivolousness.  The language of the mandate is the language of the mandate.  It says 50 percent of this judgment is owned by Tag Team.  So, to say that Isbell owns 50 percent resolves the issue.

Isbell himself seems to understand that he only owns 50 percent.  If you look at our attachment to the affidavit at 224, looking at Attachment Number 5, this is 224-5, there is a letter signed by Alvertis Isbell, where he is assigning his 50 percent interest in these items to another third party, Bridgeport Music.

And, Judge, what that tells us is since August 27th, 2015 Isbell doesn't own anything in this, with this at all.  There is an evidentiary issue as to whether he's even a creditor at all in this case.

We're talking zero dollars that Isbell is

entitled to at this point based upon his own letter that he signed over a year ago.

Now, in the context of that, and we're just learning about this. You know, we've got an issue where if Bridgeport Music is the owner of this, and Bridgeport Music doesn't have a problem with any of this, and we don't know one way or the other, because Isbell has represented all along he's the owner. Well, he's lied to us about it, he's not the owner.

So, you have to look at what -- we're going to have to obviously amend our objection to their claim, but let's go a step further. There is a current offer to purchase this -- the Whoomp! (There It Is) song for $1.7 million. $1.7 million pays the 50 percent that might be owed to Isbell, might be owed to somebody else, appears to be owed to Bridgeport, not Isbell, in full. There is a question about whether there is an attorney's fee entitlement or not. Well, over the summer Scotis (phonetic) changed the rules with respect to how attorney's fees are awarded in these cases, and they have to meet certain things. These are, these are hurdles that we don't believe Isbell can overcome with respect to what he's attempting to do.

Issues like, you know, was there a willfulness related to the infringement of the copyright?

Well, it's interesting, they love to talk about how this has been in litigation for 13 years.

Well, Judge, the reason why it's been in litigation for 13 years is because DM Records won originally. It went to appeal, and then they lost, and it went back, but there is nothing frivolous about a case where your initial issue is where you won. So how on earth are they going to state, and get to the point where they've got an entitlement to the attorney's fees, and I cite the case there, and it's the -- I'm going to misspell this, it's Kirtsaeng, K-i-r-t-s-a-e-n-g, versus John Wiley & Sons, that's the one that came, I believe it was in June of 2016, soon enough to where we don't have a cite for that, but it's easy to find that case.

So, all of a sudden we have an offer that can pay off the objecting -- the only objecting creditor in full, which by the way, Judge, means our current plan which proposes to pay everyone in 90 days from the effective date is confirmable, and in that context, that is one of the bases that the Southern District has regularly recognized as being an additional basis in the context of whether or not cases should be confirmed or not.

So we had a question as to who the creditor is at all. We have a 5th Circuit mandate telling us that

50 percent of the dollars are owed to Tag Team, and now let's talk about that for a moment.

There is the concept of the recoupment. Now recoupment -- outside the music business people don't understand what that means, and what recoupment is is you see the, you know, the rap stars and the pop stars and all these people, and they have these giant entourages, and they have to pay for the limos, and the Gold jewelry, and all of these things that the record company pays for up front, not to mention paying for, you know, all of the marketing, and development, and recording of the albums, which is roughly about $25,000 a song, I believe is what the current rate is on that, you know, just for the recordation of it, not for the marketing. Marketing is substantially more.

But the recoupment number is enough to offset the entire amount owed to Tag Team. So all of a sudden what we're looking at is a situation where genuinely we've got a claim that we don't know who the creditor is, or there is a factual issue, and a factual dispute, and we've got an 11th Circuit -- or, I'm sorry, a 5th Circuit mandate that says that there can be no more than 50 percent.

So, we have, your Honor, a factual issue, clearly, but one that sets forth very readily, and it's

Page 13

clear from the language, that we may very well have a confirmable case here, and with a confirmable case it is inappropriate that we convert the case to Chapter 7, and that's our position.

THE COURT:  All right.  Mr. Goldstein, do you care to be heard?

Then, Mr. Osborne, I'll give you an opportunity to reply.

MR. GOLDSTEIN:  Thank you, your Honor.

I can tell you I'm flabbergasted by Mr. Merrill's presentation.  His statements are absolutely outrageous.  To say that Alvertis Isbell is not a creditor in this case is just absolutely unfathomable, that those words can come out of his mouth.

There is a final, non-appealable judgment for $2.3 million in favor of my client.  It's for a willful patent infringement.  It went up on appeal.  It went up on appeal again.  They tried to bring it to the Supreme Court.  They lost, and they lost, and they lost. Had they acknowledged that they were willfully infringing on his patent 15 years ago when this started, the $2.3 million number wouldn't be nearly as large.  The $1.5 million in attorney's fees, to which we're statutorily entitled, would likewise not be as large. They owe us $3.8 million.

Page 14

To come in here today and say we don't owe you anything, despite the fact that there is a final judgment in your favor for $2.3 million, plus another $1.5 million to which we're statutorily entitled, is incredible.

Your Honor, I'd also point out that when this case was first filed, we filed the motion for stay relief to go back to the Court in Texas to liquidate the $1.5 million attorney's fee claim. They opposed that. That motion is still standing out there. When the trustee was appointed, your Honor just basically put that motion on hold.

If they thought for a minute that they really could defeat the $1.5 million in attorney's fees, they should have rushed back in here to get the stay relief to go back to Texas and do it. They filed this case very soon before that was supposed to be heard by the Texas court.

Your Honor, the plan is patently unconfirmable. To cut my client's final, non-appealable $2.3 million judgment in half just because they say Tag Team is entitled to 50 percent, is ridiculous, you can't do that. There is a final non-appealable judgment, and as Mr. Osborne said, the 5th Circuit clearly addressed the issue, they addressed it in their opinion, they said that

there was testimony that Mr. Bell, my client, was the administrator of a hundred percent of the royalties and, therefore, that it was proper for the jury to have determined that Mr. Bell was entitled to a hundred percent of the royalties, and if Tag Team had a right to it, they could deal with him, they could deal with Tag Team as Tag Team saw fit, but clearly the final, non-appealable judgment says $2.3 million to my client, another $1.5 million in attorney's fees, to which we're statutorily entitled.  They can't pay it.

When this case was -- originally came up for the appointment of a trustee, your Honor, it was on our motion to either dismiss, convert or appoint a Chapter 11 trustee.  They had an issue with having a Chapter 11 trustee appointed, and your Honor said at that point your inclination was to convert the case, and you were just appointing a Chapter 11 trustee as an accommodation to them in case there was some going concern value to this business that they could realize.

They've done really nothing to realize a going concern value to this business.  Instead they're continuing to try and litigate with my client, relitigate issues that were finally determined in Texas through appeals, and appeals, and appeals, and 15 years of litigation.  It's time to just convert the case, sell the

assets and pay my client with whatever is going to be available to pay him.  This has been going on for 15 years, and to even say that there is $1.7 million offer out there, your Honor, that's even disingenuous because it's a letter of intent.  It's a letter of intent that has conditions to it.  No one is walking in here with a signed contract, with a non-refundable deposit to purchase assets for $1.7 million.  That's not here.  There is a letter of intent out there.

If there was a real offer to purchase the real only asset of this estate, then maybe there would be something to talk about but, again, that's for $1.7 million.  We're owed $3.8 million.  So, these debtors cannot reorganize.

The financials that are attached to the plan that they filed last week clearly demonstrate that this debtor cannot reorganize.  The best that this debtor can do is to continue to try and relitigate issues that have been finally determined to just confuse, and obfuscate, and prevent my client from being paid for an additional amount of time, and it's already been 15 years.

There are additional facts that Mr. Osborne alluded to that we can get into, which I think are brought up in his papers, which relate to the boat that, candidly their principal stole.  He took it before the bankruptcy

Page 17

was filed and never paid for it.  There is usurpation of business opportunities here.  Prepetition there was a $180,000 Google payment that was paid to the debtor, that the debtor siphoned off to a sister entity, that the sister entity used to purchase music rights, which is the debtor's business, and they say there was a settlement agreement with my client related to that $180,000 in their papers.  What they basically said to my client was, if you let us have the $180,000, we won't go after you for attorney's fees and whatnot in connection with the unsuccessful involuntary bankruptcy a few years ago, and my client said, that's fine, you can have the $180,000.

That doesn't mean they got to take the $180,000, and instead of using it for the debtor and the debtor's business operation, to siphon it off to their sister entity upon which my client didn't have a garnishment and didn't have a judgment, and start developing a new business there.  So there is grounds and grounds galore for this case to be converted, and it's high time that the case can been converted, and we'd urge the Court to do so.

Thank you.

THE COURT:  All right.  Mr. Osborne, brief response to Mr. Merrill.

Page 18

MR. OSBORNE:  Yes, your Honor.  Very briefly.  Mr. Merrill filed an objection to claim, which is at 223, ECF.

THE COURT:  I've read it.

MR. OSBORNE:  And it attaches the 5th Circuit opinion, which he is quoting the one sentence that says, 100 percent of the damage award was awarded to Bell, without taking into account Tag Team's share.

However, the 5th Circuit then continues in determining whether the jury award was proper, and on Page 18 of that order, continues to say here there was evidence in the record from which the jury could have determined, as it did, that Bell is entitled to 100 percent of the royalties in the first instance.  There was testimony that Bell is the administer of 100 percent of the royalties, and is responsible for accounting to Tag Team.

As such the jury could have determined that Bell was properly awarded 100 percent of the royalties from which it could pay Tag Team its share.  It then cites a couple of other cases for the proposition that if Tag Team has a problem, they should deal with Bell, it's not for the debtor to have that issue, and then the decision of the lower court was affirmed.  So, saying 50 percent

belongs to Tag Team is completely false and in contrary to this decision.

They've also brought up this recoupment issue, which they've listed on their schedules, where they claim Tag Team owes them money, which would now offset that amount.  Except that's not what their papers say. Their papers say Tag Team owes 474.  Now all of a sudden it's $1.5 million.  It's a moving target for whatever they seem to need at the time.  It's just, it's false, and if you read this opinion, and I would also point out the same argument about Bellmark maybe or maybe not having an interest, they made that argument previously in the lower court, and at page, I thought I marked it, I'm sorry, Page 4 of the opinion, the 5th Circuit talks about, it's two paragraphs, in 2008 the District Court granted DM's motion to dismiss the complaint for lack of standing, finding that in 2004 Bell had assigned to Bridgeport Music half its interest in the compensation copyrights at issue, and all of his interest in the copyright infringement actions.

Bell appealed the dismissal and the Court reversed and remanded to the District Court.  Finally in 2012 the case went to trail.  At trial the parties each elicited testimony about the recording agreement, and the parties' subsequent actions that they claim proved that

either Bellmark or Albert Bell Music was assigned the compensation copyright.

This issue has been litigated over and over. The claim that, oh, Bell doesn't really have the judgment, the judgment is a different amount, there is a different recoupment, it's over and over the same thing.  At the end of the day if you look at their cash sales going forward, because according to their own monthly operating reports there is simply -- there is no more outstanding accounts receivable other than the few they're not collecting from Tag Team, all we have to go on is cash sales going forward, and that is not enough to reorganize this debtor. All we can do is liquidate, and that's why I'm asking for conversion.

Thank you.

MR. MERRILL:  Brief response, your Honor.

THE COURT:  Very brief.

MR. MERRILL:  Yes, your Honor.

THE COURT:  Don't repeat yourself.

MR. MERRILL:  I'll be very quick.

With respect to the boat allegation, your Honor, the boat was paid for.  The issue is that postpetition there are some payments that are due.  In fact, they -- so that allegation that there was a boat stolen is completely, factually unsupportable.

Page 21

THE COURT:  Well, that's ---

MR. MERRILL:  And the individual ---

THE COURT:  That's to be seen at a later date in a trial on the merits.

MR. MERRILL:  Yes, your Honor, and we look forward to that trial.

With respect to the issue of trying to qualify a settlement agreement that was made in 2014 as a siphoning of assets, I think that's poisonous language, and it doesn't -- you know, we attach at Document 224-2 --

THE COURT:  I've read the settlement agreement.

MR. MERRILL:  -- a copy of the settlement agreement.  So, in that context, to say that that was anyway untoward is just simply unfair.

Now let's talk about the two issues, because they've confused two different things.  The issue that was litigated had to do with what ---

THE COURT:  You're repeating yourself.

MR. MERRILL:  No, and I apologize if it appears that way.  In the context of Mr. Osborne's recitation of the 5th Circuit mandate, he is indicating that under -- that the lower court's judgment dealing with what Alvertis Bell said, and what was transferred and not

Page 22

transferred had to do with two different types of rights, and that was litigated, and that's not what we're raising here. The two different types of rights that's decided, we understand that. This is the publishing rights versus the actual royalties related to performance, we understand that.

The issue that we're saying is that on August 17th Isbell, and this is again at 224-5, we're not making this up, this is Isbell's signature. He has signed all of his rights, including licensing and collection rights to Bridgeport music. He doesn't have the claim any more, Judge. This isn't us making something up. I'm looking at this, and it's included on the record, and if Alvertis Isabel didn't tell his client that he'd assigned this away, and by the way, Judge, the one thing that I wish we had attached, and we didn't have it, we do have it now, is we have a copy of the actual assignment that's been recorded at the patent and trademark office, and a copy of that assignment which has the Schedule A referenced in 224-5, you know, is a recordation, and it is to Bridgeport Music, and it talks about Alvertis Isbell's 50 percent interest, he admits it in this recorded document, there is a recordation on the side and on the bottom where he does this, and then he lists the songs, and if you look in Schedule A and go -- and they're all

alphabetical order, very easy to find, Whoomp! (There It Is), is right there.

So for folks to say that I'm being incredible in my statements, it's there in black and white, and in the context of the 5th Circuit mandate, it's also there in black and white.

The fact that they awarded a hundred percent is not to be confused with the fact that that hundred percent includes Tag Team's 50 percent. That's what it says, and so at the end of the day I appreciate that folks think my arguments are incredible. The problem is, the only sworn to facts in this case are provided that say that this is the way it is. They're the only sworn to facts, and you've got the black and white, Judge. We've got it there in black and white, Alvertis Isbell, I don't know if he sold them, gave them away, whatever he did, but he doesn't own anything anymore, and hasn't since August of 2015. That's a problem, and that allows us in our situation to be in a situation where we can confirm this case.

THE COURT: Thank you. The Court will rule as follows: Based upon the record before me and the contents of the court file the trustee's motion to convert the Chapter 7, Docket Entry 173, will be granted for the reasons argued on the record by Trustee Osborne and

Goldstein, as well as the contents of the Court file.

Mr. Osborne, see to the order.

MR. OSBORNE:  Yes, sir.

(Thereupon, the hearing was concluded.)

Page 25

CERTIFICATION

STATE OF FLORIDA        :

COUNTY OF MIAMI-DADE    :


          I, Cheryl L. Jenkins, RPR, RMR, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing proceedings were transcribed by me from a digital recording held on the date and from the place as stated in the caption hereto on Page 1 to the best of my ability.

          WITNESS my hand this 27th day of October, 2016.



          _____

          CHERYL L. JENKINS, RPR, RMR

          Court Reporter and Notary Public
       in and for the State of Florida at Large
             Commission #FF064003
             December 27, 2017